IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KENNETH HUGGINS, SR.,** | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **COATESVILLE AREA** | : | |
| **SCHOOL DISTRICT, et al.,** | : | |
| Defendants | : | NO. 07-4917 |

**M E M O R A N D U M**

PRATTER, J.                                                                                                    SEPTEMBER 16, 2009

**INTRODUCTION**

    When lawyers place a higher value on being heard than on being understood, when they trample on civility, or when their supposed devotion to their clients leads to stridency[1] or worse, they undercut the belief in the law and in the legal profession.  At a minimum, uncivil, abrasive, abusive, hostile or obstructive conduct by lawyers impedes the fundamental goal of resolving disputes rationally, peacefully, and efficiently.  Because such conduct tends to delay, and can even deny, justice, a presiding judge may be called upon to determine whether one or more adversary has committed sanctionable conduct.  Events in this case present the Court with that unwelcome task.

    Kenneth Huggins, Sr., sued the Coatesville Area School District and various District officials and employees for their allegedly racially discriminatory and improperly retaliatory conduct toward him while he served as a custodian for the School District.[2]  The litigation has

---

[1] See Grider v. Keystone Health Plan Central, Inc., ___ F.3d ___, No. 08-3073, et al., 2009 WL 2750450, at *23 (3d Cir. Sept. 1, 2009).

[2] This case was filed in 2007.  Defendants moved to dismiss the Complaint, and the Court granted that motion in part, ending the case against some of the Defendants, but leaving claims

progressed slowly through preliminary motions and into discovery.

At some point during the discovery phase of the litigation, counsel undeniably and intentionally crossed the line between appropriately aggressive advocacy and unrestrained, pointless offensive name-calling.  In response, Defendants filed Motions for a Protective Order and for Sanctions against Mr. Huggins and his attorney because of Plaintiff's counsel's behavior. Following the oral argument on the Motions, during which the Court elicited the lawyers' descriptions and explanations of their own and each other's conduct, the Court ruled on the Motion for a Protective Order.  The Court also provided both parties an opportunity to submit supplemental briefing on the sanctions motion.

The Court has again reviewed all of the submissions, as well as the transcript from the oral argument, hoping that with the passage of time the conduct of counsel would appear to be less offensive - - or at least closer to the lowest common acceptable denominator of professional conduct for a lawyer participating in litigation in federal court in the 21st century.  However, time has not improved the picture.

Pursuant to the Court's inherent powers to control litigation pending before it, as well as the standards articulated by Rule 30(d)(2) of the Federal Rules of Civil Procedure and Rule 83.6.1 of the Local Rules of Civil Procedure for this District, the Court now grants in part and denies in part Defendants' Motion for Sanctions.

---

against the Coatesville Area School District and Dr. Walker.  Earlier this year, Mr. Huggins filed a second complaint against many of the same Defendants for alleged ongoing discrimination, including by some of the Defendants who had been dismissed previously from that original suit. See Huggins v. Coatesville Area Sch. Dist., Civil Action No. 09-1309.  In the second action, Defendants again filed a motion to dismiss, which was again granted, disposing of some, but not all, of the Plaintiff's claims.  Defendants have answered the complaints in both actions, and a defense summary judgment motion is currently pending in the original action.

**FACTUAL AND PROCEDURAL BACKGROUND**

School District witnesses Dr. Walker and Mr. Quinones[3] arrived at the Coatesville Area School District's Benner Building for their June 5, 2009 depositions. Plaintiff's counsel, Mr. Hannah, had scheduled the depositions. Mr. Quinones was to be deposed at 9:00 a.m. and Dr. Walker at 11:00 a.m. Instead of proceeding according to the schedule, Mr. Hannah elected to depose Dr. Walker first.[4] Not long into the deposition,[5] the exchanges between the attorneys became, to say the least, heated, personal, rude, and pointless. Having reviewed the transcript of the aborted deposition, and having listened to the lawyers recount the events in the course of the oral argument, the Court concludes that both attorneys contributed to the escalation of tensions and the descent of their behavior at the deposition.[6] However, Mr. Hannah racheted the acrimony higher and the standards lower, using a few choice epithets for Mr. Ellison, by angrily referring to defense counsel at least four times as, among other things, a certain unattractive end-piece of anatomy.

According to the Defendants, during the Walker deposition Mr. Hannah also threatened

---

[3] Dr. Walker is a defendant in the original action. Mr. Quinones was dismissed from the first action but remains a defendant in the second action.

[4] According to his submissions to the Court, Mr. Hannah states that he made this scheduling change when he found out that Mr. Quinones had not brought with him documents that had been subpoenaed by Mr. Hannah.

[5] By page 62 of the 139-page transcript, the exchanges between the attorneys had begun to devolve into personal squabbling. See Walker Dep. Tr. at 62.

[6] For instance, when Defendants' counsel, Mr. Ellison, objected to a question posed by Mr. Hannah to Dr. Walker, Mr Hannah responded, "Shut up. You are such an a-hole." Mr. Ellison's rejoinder was, "Next question. Dr. Walker, [Mr. Hannah]'s off his meds today. Pay no attention to that." See Walker Dep. Tr. at 112, lines 18-22.

to have an unlicensed paralegal assistant complete the deposition.  Mr. Hannah explained in his response to Defendants' sanctions motion that the paralegal was in the process of attempting to regain his license to practice law following a suspension, and Mr. Hannah's side comment, which followed an agitated exchange with Mr. Ellison, asking whether the paralegal was "ready to go back on the saddle" referred to whether the paralegal was ready to be a licensed practicing litigator again, not to whether he was ready to step in and take the Walker deposition that day.

The hostility continued to escalate throughout the deposition.  At one point, Mr. Ellison remarked about the skill of Mr. Hannah's mother in imparting proper manners to her son.  See June 26, 2009 Hearing Tr. at 11.  Then, at another point in the deposition, Mr. Hannah derisively called Mr. Ellison "Boy."[7]  See id. at 11, 18.  Eventually, after incessant insult exchanges and aggressive questioning and objecting as documented in the deposition transcript, defense counsel and the witness walked out of the deposition.  Although the lawyers saw fit to call the Court during the deposition for a ruling on the scope of proper questioning, no mention was made at that time of the name-calling and similar behavior.  According to the transcript, the offending conduct occurred both before and after the application to the Court.  See, e.g., Walker Dep. Tr. at 69, 82, 110, 112.

Thereafter, Mr. Huggins re-noticed the depositions of the two witnesses.  In response, Defendants argued that Plaintiff's counsel's conduct at the originally scheduled deposition should bar him from re-noticing the depositions.  Defendants also requested sanctions in the form

---

[7] One of Mr. Huggins's allegations in his suit is that Dr. Walker called him "Boy," which Mr. Huggins in the Complaint drafted by Mr. Hannah describes as "racially offensive and dis-empowering."  Complaint at ¶¶ 26-27.  Mr. Huggins, Mr. Hannah and Mr. Ellison are all African-American men.

of costs and attorneys' fees. The Court heard oral argument on the motions and, in a June 26, 2009 Order, granted in part and denied in part the Motion for a Protective Order, and invited supplemental briefing with regard to the Motion for Sanctions.[8]

**LEGAL STANDARD**

The decision to impose sanctions for the conduct of counsel during discovery is generally entrusted to the Court's sound discretion. Bowers v. NCAA, 475 F.3d 524, 538 (3d Cir. 2007). Various enacted rules specifically address counsel's obligations and the Court's role in enforcing minimum professional standards. Under Fed. R. Civ. P. 30(d)(2), for example, "The court may impose an appropriate sanction--including the reasonable expenses and attorney's fees incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the deponent." Rule 30(d) was amended in 1993 to respond to a rise in reports of misconduct in depositions. The Advisory Committee Notes provide the following guidance and explanation for the rule: "In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer."[9] Similarly, under the Rules of Professional

---

[8] The Court recognizes that the allegations here and the risk of sanctions are of grave significance to the litigants and to counsel whose conduct is under scrutiny. See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 191 (3d Cir. 2002); GMAC Bank v. HTFC Corp., 248 F.R.D. 182 (E.D. Pa. 2008). Accordingly, due process notice was afforded all concerned here so that counsel had ample opportunity at oral argument and in initial and supplemental briefing to defend or explain the conduct at issue and, to the extent possible, endeavor to ameliorate the risks of sanctions.

[9] There should be no mistaking that the Court would not accept, permit or tolerate in the Court's presence any of the name-calling and childish baiting behavior such as is documented on the transcript of the June 5, 2009 deposition of Dr. Walker in this case. The Court is equally certain that no other judicial officer would have permitted the conduct to have occurred in the judicial officer's presence. Indeed, the Court confidently assumes that counsel would not have behaved as they did if any judicial officer had been present to witness their behavior first-hand.

Conduct governing lawyers in practice in the Commonwealth of Pennsylvania,[10] in particular, Rule 3.5(d), a lawyer shall not "engage in conduct intended to disrupt a tribunal." The definition of "tribunal" includes depositions. See Comment [5] to R. Prof. Conduct 3.5.[11]

**DISCUSSION**

Defendants assert that in addition to the obvious incivility of using foul language, Plaintiff's counsel's conduct improperly delayed and frustrated the fair examination of Dr. Walker during her deposition. Mr. Hannah's offending outbursts, documented in the transcript of the foreshortened deposition, were undeniably disruptive. It was not merely a single, isolated incident. By the same token, however, neither was Mr. Hannah's angry and inexcusable behavior incessantly pervasive.[12] To complete the behavioral picture, Defendants' counsel

---

[10] Lawyers practicing in this Court are obliged to comply with the Rules of Professional Conduct. See Eastern District of Pennsylvania Local Civil Rules, Rule 83.6, Rule IV, which expressly adopts the Rules of Professional Conduct, violation of which constitutes misconduct that can subject the offending lawyer to the Court's disciplinary action.

[11] The Preamble to the Rules, although not an enforceable rule itself, imparts an important orientation for understanding the Rules and the principles being espoused: "These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system."

[12] By way of comparison, the outbursts complained of here, while more pervasive than the single incident in Wetzel v. Hyatt Corp., Civ. A. No. 91-7406, 1992 WL 122928 (E.D. Pa. June 1, 1992) (refusing to grant sanctions against either party when one attorney uttered a single expression of profanity at a deposition and opposing counsel refused to continue the deposition because of it), were less pervasive than the offensive conduct in GMAC Bank v. HTFC Corp., 248 F.R.D. 182 (E.D. Pa. 2008) (sanctioning both lawyer and client when client repeatedly used profanity ("f—" or some variant thereof was used at least 73 times), threatened opposing counsel, refused to answer questions, and made his own objections at a deposition and his attorney did nothing to curb this abusive behavior). See also Saldana v. Kmart Corp., 260 F.3d 228 (3d Cir. 2001), in which the appellate court overturned sanctions imposed upon an attorney who used profanity during telephone conferences with opposing counsel and described an expert witness as

admits that he engaged in a heated argument with Plaintiff's counsel during the deposition, and that he and the witness were the ones to walk out after a deposition break, thereby discontinuing the deposition.  Thus, the arguments and name calling that erupted at the Walker deposition may not have been entirely one-sided and may not have been the exclusive reason for delayed and more costly discovery.

Mr. Hannah claims, even in the stark light of the deposition transcript, that at all times he was polite and respectful of the witness, Dr. Walker.  Implicitly admitting that his might be an unconventional view of polite and respectful interaction, Mr. Hannah tries to justify his own behavior by complaining that Defendants' counsel intentionally provoked him with "constant objections" during the deposition.  As for his conduct towards the witness, Plaintiff's counsel candidly admitted at oral argument that he intentionally sought to make the witness "uneasy" and "to get an edge on [his] advocacy" by deliberately addressing the witness "Ms." Walker, rather than "Dr." Walker, even though counsel knew full well that the witness had earned a doctorate degree and routinely was known as "Dr. Walker" in formal or business settings.  As expressed by Mr. Hannah, this gamesmanship was a litigation "technique" of deliberately disrespecting an

---

a "Nazi,"  and where there were 4 incidents of using profanity (2 during telephone conferences and 2 as asides at a deposition) which did not cause any delay of the proceedings.

The Court fully appreciates the appellate court's power to guard against abuses of discretion, and to correct errors, by the trial court, lest the proximity of the trial court to the on-going conduct of the litigation cloud the court's dispassionate consideration of counsel's behavior. See, e.g., Grider v. Keystone Health Plan Central, Inc., ___ F.3d ____, No. 08-3073, et al., 2009 WL 2750450 (3d Cir. Sept. 1, 2009).  Nonetheless, each court has an inescapable and important duty to preserve the decorum of the judicial process and the conduct of litigation.  On occasion – and the Court views this as one – the Court must accept the obligation to remind lawyers that they owe the judicial system the fundamental duties of personal dignity and professional integrity, coupled with a duty of courtesy and cooperation with fellow professionals for the efficient administration of our system of justice and the respect of the public it serves.

opposing litigant-witness of which Mr. Hannah actually seemed proud and with which he was apparently very familiar.  At a minimum, this admission cuts directly against Mr. Hannah's assertion that he at all times treated Dr. Walker with due respect.  While the vigorous objections of opposing counsel may be frustrating, such conduct cannot and does not justify Mr. Hannah's plunge to name-calling and intentionally disrespecting someone in order "to get an edge."  Likewise, provocation will not justify the use of the very same racially charged epithet on which his own client partially bases his claims.  Certainly this behavior "impede[d], delay[ed] or frustrate[d] the fair examination of the deponent" by unnecessarily and pointlessly escalating the already-volatile environment created by both parties's counsel.

In addition, counsel's behavior falls far short of that which lawyers are to exhibit in the performance of their professional services.  Treating an adversary with advertent discourtesy, let alone with calumny or derision, rends the fabric of the law.  Although not rules that demand mandatory compliance, there are any number of published standards that remind lawyers what is expected of them in terms of civility.  For example, in October 2000 the Philadelphia Bar Association published in the <u>Philadelphia Bar Reporter</u> its proposal for "Principles of Professionalism" that included the following Guideline:

> We will not condone or indulge in offensive conduct directed to the court or its staff, counsel, parties or witnesses.  We will abstain from disparaging personal remarks or acrimony and encourage our clients to do so as well.

The same Bar Association adopted various "Working Rules of Professionalism" which included as Rule 1:

> Treat with civility opposing counsel, lawyers and their staffs, witnesses and the courts and court officers.  Professional courtesy is a virtue, not a shortcoming.  It is entirely

compatible with vigorous advocacy and zealous representation.

Likewise, the Pennsylvania Bar Association established similar "Working Rules for Professionalism" in 2002, making its "First Rule":

> Treat with civility the lawyers, clients, opposing parties, the Court, and all the officials with whom we work.  Professional courtesy is compatible with vigorous advocacy and zealous representation.

Numerous other bar associations and professional societies have officially embraced equally pointed tenets.[13]

---

[13] In 1998 the American Bar Association Section of Litigation set certain aspirational goals for lawyers' conduct, introducing them as follows: "A lawyer's conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those words."  As for duties owed to other counsel, those goals provide for "treat[ing] all other counsel, parties and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications," declining to, "even when called upon by a client to do so, abuse or indulge in offensive conduct directed to other counsel, parties or witnesses" and "abstain[ing] from disparaging personal remarks or acrimony toward other counsel, parties or witnesses."  Likewise, in 1989, almost a decade earlier, the ABA's Section of Tort and Insurance Practice adopted a "Lawyer's Creed of Professionalism" that provides: "With respect to opposing parties and their counsel . . . I will endeavor to be courteous and civil, both in oral and in written communications . . . In depositions . . . I will conduct myself with dignity, avoid making groundless objections and refrain from engaging in acts of rudeness or disrespect."  The Washington, D.C. Bar Board of Governors adopted Voluntary Standards for Civility in Professional Conduct in 1996, including as Standard No. 16: ". . . We will not engage in any conduct during a deposition that would not be appropriate if a judge were present;" and as Standard No. 22: "During discovery, we will not engage in acrimonious conversations or exchanges with opposing counsel, parties or witnesses . . . We will not engage in undignified or discourteous conduct which degrades the legal proceeding."  And the second tenet of the Tenets of Professionalism adopted by the International Association of Defense Counsel provides: "We recognize that professional courtesy is consistent with zealous advocacy.  We will be civil and courteous to all with whom we come in contact and will endeavor to maintain a collegial relationship with our adversaries . . . We will not make groundless accusations of improprieties or attribute bad motives to other attorneys without good cause."  The upshot of all these and the many similar codes of conduct is, of course, reminiscent of George Washington's oft-quoted "Rules of Civility & Decent Behaviour in Company and Conversation" which are commended to counsel for additional reference.  In any event, it should be clear that from a professional conduct

In determining the proper sanction for this misconduct, the Court recognizes that requiring Mr. Hannah and/or his client to pay the costs and fees Mr. Ellison and his clients incurred in bringing the motion is not the most appropriate one, especially given that Mr. Ellison was not an innocent bystander in this debacle.  Thus, the Court will deny the specific defense request for fees, in favor of a sanction that the Court hopes will have greater long-term substantive effect.  The Court shall require Mr. Hannah to attend a CLE course dealing with civility and professionalism.  Because this case has not yet concluded and because defense counsel is not without blame for the embarrassing conduct of the professionals here, inasmuch as the working relationship between these opposing counsel will necessarily continue, the Court also will expect Mr. Hannah and Mr. Ellison to join each other for an informal meal in an effort to facilitate the repair of their professional relationship.[14]  Counsel then will submit a joint status report to inform the Court of their efforts to restore their conduct in this case to a level of professionalism for attorneys practicing before this Court that more closely approximates the conduct espoused by the civility codes and enactments referenced in this memorandum.  To quote Supreme Court Justice Anthony Kennedy's speech at the 1997 ABA Annual Meeting,

---

standpoint, the Court interprets all of the rules, codes, tenets, and principles – whether mandatory or precatory – as reflecting the view that there is no place in the profession for disparaging the intelligence, ethics, morals, integrity or personal behavior of one's adversaries unless such things are directly and necessarily in issue.

[14] Over 400 years ago, William Shakespeare apparently believed that the legal profession provided a useful example for achieving civility when, in <u>The Taming of the Shrew</u>, he wrote "And do as adversaries do in law, Strive mightily but eat and drink as friends."  At the end of the day, it should not be merely intelligence, skepticism, oratorical flourish or the like that truly distinguishes the legal profession from others.  Rather, as Shakespeare recognized, one hopes and expects that it also is civility.  Perhaps the adversaries in this case can be reinspired to achieve the Shakespearean vision and the aspirational goals of the very rules of professional conduct by which counsel have pledged to abide.

"[Civility . . .] is not some bumper-sticker slogan, 'Have you hugged your adversary today?' Civility is the mark of an accomplished and superb professional, but it is even more than this. It is an end in itself. Civility has deep roots in the idea of respect for the individual."

**CONCLUSION**

For the reasons discussed above, the Court grants in part and denies in part Defendants' Motion for Sanctions. An Order consistent with this Memorandum follows.

                                            BY THE COURT:

                                            S/Gene E.K. Pratter
                                            GENE E.K. PRATTER
                                            United States District Judge